FILED
SEP 29 2009


UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

*********************************************************************

| | | |
|---|---|---|
| THE SISSETON – WAHPETON OYATE; ROSEBUD SIOUX TRIBE; SANTEE SIOUX TRIBE OF NEBRASKA; and YANKTON SIOUX TRIBE, | * * * * * | CIV. 08-3023 **2009 D.S.D. 12** |
| Plaintiffs, | * * | |
| -vs- | * * | |
| UNITED STATES DEPARTMENT OF STATE; HILLARY CLINTON, in her official capacity as Secretary of State; REUBEN JEFFERY III, in his official capacity as Under Secretary of State for Economic, Energy and Agricultural Affairs; ELIZABETH ORLANDO, in her official capacity as NEPA Coordinator, Keystone EIS Project Manager, U.S. Department of State; and the UNITED STATES OF AMERICA, Defendants, | * * * * * * * * * * * * * * | MEMORANDUM OPINION AND ORDER |
| TRANSCANADA KEYSTONE PIPELINE, LP, Defendant-Intervenor. | * * * * | |

*********************************************************************

**KORNMANN, U.S. DISTRICT JUDGE**

[¶1.] Defendant, United States of America, has filed a motion to dismiss for lack of jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1) and, alternatively, for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6), Doc. 26. Defendant-Intervenor has also filed a motion to dismiss for the same reasons, Doc. 27.

# FACTS

[¶2.]   On April 30, 2004, President George W. Bush issued Executive Order 13337. This order details the procedures necessary for the issuance of permits for certain types of energy related facilities that cross international boundaries into the United States.[1] Among other things, Executive Order 13337 delegated the responsibility of receiving applications for the Presidential permits to the Secretary of State who was authorized to approve or deny permits based on "national interest." The Secretary of State, in turn, delegated the authority to the Under Secretary of State for Economic, Energy, and Agricultural Affairs.

[¶3.]   If an official, who was required to be consulted under Executive Order 13337, disagreed with the Secretary's determination, the application would be forwarded to the President for consideration. The President retained the final authority to determine whether a permit should be issued.

[¶4.]   On January 17, 2006, the Department of State ("Department") sent a letter to the Sisseton Whapeton Tribal Historical Preservation Office ("THPO") asking the office to coordinate a Section 106 government-to-government consultation regarding the proposed project.[2]

[¶5.]   The Department received a preliminary report on the cultural resources aspect of the proposed pipeline from the South Dakota State Historical Preservation Office ("SHPO") on March 28, 2006. However, this report contained no comments from the plaintiffs.

[¶6.]   On April 19, 2006, TransCanada Keystone Pipeline, LP ( "Keystone") filed an application for a permit to construct, operate, and maintain a cross-border crude oil pipeline from a crude oil supply hub in Canada to oil refineries and oil distribution terminals in the United States. This proposed project fell within the scope of Executive Order 13337. The proposed pipeline was to be 30 - 34 inches in diameter and buried 48-60 inches below the surface of the ground.

---

[1]On May 18, 2001, President Bush also issued Executive Order 13212, which sets forth the policy of his administration to "expedite projects that will increase the production, transmission, or conservation of energy." Executive Order 13337 furthers that policy.

[2]Section 106 of the National Historic Preservation Act of 1966 requires Federal agencies to take into account the effects of their undertakings on historic properties and afford those affected a reasonable opportunity to comment on such undertakings.

Additionally, was at maximum capacity, the pipeline is expected to transport approximately 591,000 barrels of oil per day.

[¶7.] In June, 2006, the Department wrote to the Sisseton-Whapeton THPO indicating that no cultural resources were located near the proposed pipeline based on the surveys that were conducted, but if the plaintiffs had concerns, they should contact the Department within 30 days.

[¶8.] Elizabeth Orlando, Project Coordinator for the Department, was the Department official who consulted with the plaintiffs pursuant to Section 106 of the National Historic Preservation Act of 1966 ("NHPA"). Orlando sent letters to each of the plaintiffs in August and September, 2006 requesting that they join the Department in "consultation" regarding the proposed project.

[¶9.] The Department issued a Notice of Intent ("Notice" or "NOI") on October 4, 2006. The Notice, which was published in the Federal Register, informed the public of the Department's intent to prepare an Environmental Impact Statement ("EIS") and to Conduct Public Scoping Meetings. See 71 Fed. Reg. 59,849 - 59,851. The notice also solicited public comments for consideration in establishing the scope and content of the environmental review process. Thirteen public scoping meetings were held regarding the proposed pipeline, including one in Clark, South Dakota, and one in Yankton, South Dakota.

[¶10.] Between December, 2006 and October, 2007, pursuant to §106 of the NHPA, the Department and plaintiffs engaged in at least four meetings about the proposed pipeline, which included addressing the plaintiffs' environmental and archeological concerns. At these meetings, plaintiffs also requested a survey of 100% of the pipeline construction corridor for traditional cultural properties.[3]

---

[3] On May 30, 2007, a meeting was held at the Dakota Magic Casino in North Dakota between the Department and, according to the amended complaint, "people from a few tribes."

On August 28 and 29, 2007, the Department conducted a meeting in Flandreau, South Dakota.

On October 24 and 25, 2007, a meeting was held at the Prairie Knights Casino in Fort Yates, North Dakota.

Additionally, a government-to-government meeting was held in Washington, DC

[¶11.] On August 10, 2007, the Department issued a Draft Environmental Impact Statement ("DEIS"). A final Environmental Impact Statement ("FEIS") was issued on January 11, 2008. These statements were issued pursuant to the National Environmental Policy Act of 1969 ("NEPA").

[¶12.] On January 30, 2008, the Programmatic Agreement governing the project was signed. However, the plaintiffs refused to sign the agreement.[4]

[¶13.] On February 28, 2008, the Department issued a Record of Decision ("ROD") indicating its intention to issue a Presidential Permit to Keystone.

[¶14.] On March 11, 2008, the Presidential Permit was signed by the Department, which granted Keystone permission to bring the pipeline across the border of Canada into the United States.

[¶15.] On November 24, 2008, the plaintiffs filed this lawsuit.

## DISCUSSION

### I. STANDARD OF REVIEW

[¶1.] "Federal courts are not courts of general jurisdiction and have only the power that is authorized by Article III of the Constitution and statutes enacted by Congress pursuant thereto." Marine Equipment Management Co. v. United States, 4 F.3d 643, 646 (8th Cir. 1993) (*citing* Bender v. Williams-Port Area School Dist., 475 U.S. 534, 541, 106 S. Ct. 1326, 1331, 89 L. Ed. 2d 501, *reh'g denied* 476 U.S. 1132, 106 S. Ct. 2003, 90 L. Ed. 2d 682 (1986), (*citing in turn* Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L. Ed. 60 (1803))). "The threshold inquiry in every federal case is whether the court has jurisdiction," and the Eighth Circuit has "admonished

---

on December 18, 2007.

> Finally, on July 14, 2007, the Department scheduled a teleconference meeting inviting, among others, all SHPOs, THPOs, and tribes affected by the proposed pipeline to participate. Plaintiffs, however, refused to participate, stating that the teleconference would not satisfy the requirements for a government-to-government consultation.

[4]A programmatic agreement is a document that governs "the implementation of a particular program or the resolution of adverse effects from certain complex project situations or multiple undertakings." 36 C.F.R. §800.14(b). The use, development, and effect of a programmatic agreement are set forth under 36 C.F.R. §800.14(b).

4

district judges to be attentive to a satisfaction of jurisdictional requirements in all cases." Rock Island Millwork Co. v. Hedges-Gough Lumber Co., 337 F.2d 24, 26-27 (8th Cir. 1964), and Sanders v. Clemco Industries, 823 F.2d 214, 216 (8th Cir. 1987).

[¶2.] A motion to dismiss for lack of subject matter jurisdiction challenges the court's power to hear the case. Mortensen v. First Savings and Loan Association, 549 F.2d 884, 891 (3d Cir. 1977). Jurisdictional issues are for the court to decide and the court has broad power to decide its own right to hear a case. Osborn v. United States, 918 F.2d 724, 729 (8th Cir. 1990) (*quoting* Williamson v. Tucker, 645 F.2d 404, 413 (5th Cir. 1981)). Because jurisdiction is a threshold question, judicial economy demands that the issue be decided at the onset. Osborne, at 729.

[¶3.] Where, as here, the defendants move for dismissal under Rule 12(b)(1), Fed.R.Civ.P., as well as on other grounds, "the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined." 5 C. Wright and A. Miller, Federal Practice and Procedure, § 1350, p. 548 (1969). *cf.* Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946) (motion to dismiss for failure to state a claim may be decided only after finding subject matter jurisdiction). "In order to properly dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the complaint must be successfully challenged on its face or on the factual truthfulness of its averments." Titus v. Sullivan, 4 F.3d 590, 593 (8th Cir. 1993).

[¶4.] "The district court has the authority to consider matters outside the pleadings on a motion challenging subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)." Drevlow v. Lutheran Church, Mo. Synod, 991 F.2d 468, 470 (8th Cir. 1993). *See also* Osborn, 918 F.2d at 729, fn. 4 (*citing* Land v. Dollar, 330 U.S. 731, 735 & fn. 4, 67 S.Ct. 1009, 1011 & fn. 4, 91 L.Ed. 1209 (1947), and Satz v. ITT Fin. Corp., 619 F.2d 738, 742 (8th Cir. 1980)). Such consideration does not convert a motion to dismiss into a motion for summary judgment. Deuser v. Vecera, 139 F.3d 1190, 1191 fn. 3 (8th Cir. 1998), Drevlow v. Lutheran Church, Mo. Synod, 991 F.2d 468, 470 (8th Cir. 1993). Plaintiffs have the burden of establishing that jurisdiction exists. It is not the responsibility of defendants to prove otherwise. Titus, 4 F.3d at 593 fn. 1.

[¶5.] The Eighth Circuit, in Osborn, delineated the standard of review for motions to dismiss under Fed. R. Civ. P. 12(b)(1):

> [H]ere the trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction – its very power to hear the case – there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist.

918 F.2d at 730 (*quoting* Mortensen v. First Fed. Sav. & Loan Ass'n., 549 F.2d at 891).

## II. Standing.

[¶6.] "A party invoking federal jurisdiction must establish that he has met the requirements of both constitutional and prudential standing." Delorme v. United States, 354 F.3d 810, 815 (8th Cir. 2004) (*citing* Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). When ruling on a motion to dismiss for want of standing, the court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

[¶7.] Constitutional standing is comprised of three elements:

> First, the plaintiff must have suffered an injury in fact--an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of--the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan v. Defenders of Wildlife, 504 U.S. at 560-61, 112 S.Ct. at 2136 (internal quotations and citations omitted). Plaintiffs have the burden of establishing these three elements. Campbell v. Minneapolis Public Housing Authority, 168 F.3d 1069, 1073 (8th Cir. 1999).

[¶8.] The defendants claim plaintiffs lack standing because plaintiffs are unable to prove that a decision in their favor would result in the injury being redressed. The court agrees. Even if the

most egregious violations of the NHPA and NEPA have occurred, which they have not, plaintiffs are asking the court to direct the Department to "suspend and/or revoke the Presidential Permit." However, if the court were to do so, the President would still be free to issue the permit again under his inherent Constitutional authority to conduct foreign policy on behalf of the nation.[5]

[¶9.] In other words, the President would be free to disregard the court's judgment, and as the Supreme Court has held, "if the President may completely disregard the judgment of the court, it would be only because it is one the courts were not authorized to render." Chicago & Southern Air Lines v. Waterman S. S. Corp. 333 U.S. 103, 113, 68 S.Ct. 431, 437 (U.S. 1948)

[¶10.] Said another way, in determining whether the plaintiffs can meet the redressability prong of the standing requirement, the actions of the President, a third party, must be considered. "This is a problem because for this approach to be successful the defendant must have control over the third party's (case-relevant) behavior" Ashley v. U.S. Dept. of Interior, 408 F.3d 997, 1003 (8th Cir. 2005). The defendants here, collectively the Department, do not have control over the President's behavior. Consequently, on these facts, it is purely speculative that a favorable ruling

---

[5] This case revolves around the unique aspect of the President's inherent constitutional authority to act rather than statutory authority. As the Supreme Court has noted:

> It is important to bear in mind that we are here dealing not alone with an authority vested in the President by an exertion of legislative power, but with such an authority plus the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations-a power which does not require as a basis for its exercise an act of Congress, but which, of course, like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution.
>
> It is quite apparent that if, in the maintenance of our international relations, embarrassment-perhaps serious embarrassment-is to be avoided and success for our aims achieved, congressional legislation which is to be made effective through negotiation and inquiry within the international field must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved.

U.S. v. Curtiss-Wright Export Corporation 299 U.S. 304, 319-320, 57 S.Ct. 216, 221 (1936)

7

by this court would redress the injuries of which the plaintiffs complain. To meet the requirements of standing requires more; plaintiffs have failed to clear this necessary initial hurdle.

[¶11.] Assuming, *arguendo*, however, that plaintiffs do meet the standing requirement, their claims will still fail. Plaintiffs bring their claim under the National Environmental Protection Act of 1969 ("NEPA"), the National Historic Preservation Act of 1966 ("NHPA") and the Administrative Procedures Act ("APA").[6] These statutory provisions are discussed in turn.

## III. NEPA

[¶12.] Congress' purpose in enacting the National Environmental Protection Act, 42 U.S.C. §4331 et seq., was, *inter alia*, to "create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." Id. In order to carry out this policy, Congress mandated that the federal government "use all practical means, consistent with other essential considerations of national policy . . . [to] (4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice." Id.

[¶13.] With that background painted, the operative question becomes: "does NEPA provide the plaintiffs with a private cause of action?" The answer is "no." It is well established that NEPA does not create a private right of action. See, <u>Central South Dakota Co-op. Grazing Dist. v. Secretary of U.S. Dept. of Agriculture</u>, 266 F.3d 889, 894 (8th Cir. 2001) Therefore, plaintiffs cannot seek recovery for a violation of NEPA standing alone. However, this court may still have jurisdiction over a challenge to NEPA if it can be connected with a proper claim under the APA.

---

[6]Plaintiffs initial complaint also sought relief under the American Indian Freedom of Religion Act ("AIRFA"), 42 U.S.C. §1996, the Archaeological and Historic Preservation Act ("AHPA"), 16 U.S.C. §469 et. seq., the Archaeological Resources Protection Act ("ARPA"), 16 U.S.C. §470aa-mm, and the Native American Graves Protection Repatriation Act ("NAGPRA"), 25 U.S.C. §3002(a). In their amended complaint, however, plaintiffs have stricken claims for relief under these provisions.

## IV. NHPA

[¶14.] In 1966, Congress enacted the National Historic Preservation Act, finding that "the spirit and direction of the Nation are founded upon and reflected in its historic heritage" 16 U.S.C. § 470(b)(1). Moreover, "Congress has determined that 'the historical and cultural foundations of the Nation should be preserved as a living part of our community life and development in order to give a sense of orientation to the American people,' . . . and has enacted a series of measures designed to encourage preservation of sites and structures of historic, architectural, or cultural significance." Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 108, 98 S.Ct. 2646, 2651 (1978) (quoting National Historic Preservation Act of 1966, 80 Stat. 915, 16 U.S.C. § 470(b) (1976 ed.)).

[¶15.] As with NEPA, the threshold question to be answered is, "does NHPA provide the plaintiffs with a private cause of action?" The answer to this question is less clear. To support its claim that there is a private cause of action under NHPA, plaintiffs cite to Yankton Sioux Tribe v. United States Army Corps of Engineers, 194 F.Supp2d 977, 990 (D.S.D. 2002). The court in Yankton Sioux Tribe determined that there is a private cause of action under NHPA.

[¶16.] However, nothing in the statutory language of NHPA explicitly authorizes a private cause of action. Furthermore, the United States Court of Appeals for the Eighth Circuit and the United States Supreme Court have not ruled on whether NHPA provides a private cause of action. The Supreme Court has, however, ruled on private causes of action, generally. "The question of the existence of a statutory cause of action is, of course, one of statutory construction" and the "central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action." Touche Ross & Co. v. Redington, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 2489 (1979). "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." Alexander v. Sandoval 532 U.S. 275, 286, 121 S.Ct. 1511, 1519 (2001) (citing Touche Ross & Co. at 578).

[¶17.] The Third and Fifth Circuits, relying on the attorney's fees provision of the NHPA, have both held that NHPA does create a private cause of action. *See* Boarhead Corp. v. Erickson, 923 F.2d 1011, 1017 (3rd Cir.1991), and Vieux Carre Prop. Owners, Residents & Assoc., Inc. v.

Brown, 875 F.2d 453, 458 (5th Cir.1989). More recently, however, the Ninth Circuit, in considering Sandoval, held that, NHPA does not create a private cause of action.

> We agree [the attorney's fee provision] demonstrates Congressional intent that individuals may sue to enforce NHPA. And we agree that the attorney's fees language evinces congressional intent to cover the costs of those who prevail in a suit under the statute. But it does not follow that Congress intended these individuals to file suit against the United States under NHPA itself, rather than under the well-established procedures set out under the APA. At best, the absence of any private right of action language . . . and the presence of the fee provision render the statute ambiguous on the cause of action point. Without explicit language, such an ambiguity can hardly be converted into an implied right of action.

San Carlos Apache Tribe v. U.S., 417 F.3d 1091, 1099 (9th Cir. 2005)

[¶18.] San Carlos is instructive here. I find that no private right of action was created by the NHPA, and therefore, this court can consider a violation of NHPA, like NEPA, only within the confines of the APA.

V.   APA

[¶19.] The Administrative Procedures Act ("APA") provides for judicial review of agency action when the claim for relief identifies some particular agency action and the agency action in question is final. *See* 5 U.S.C. § 701 and Lujan v. National Wildlife Fed'n., 497 U.S. 871, 882 (1990). The APA defines "agency" as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include (A) the Congress; (B) the courts of the United States; (C) the governments of the territories or possessions of the United States; (D) the government of the District of Columbia." 5 U.S.C. §§ 701(b)(1). At issue here, is the issuance of the Presidential Permit pursuant to Executive Order 13337.

[¶20.] A court has subject matter jurisdiction to review action under the APA where the claim for relief identifies a particular agency action and the agency action in question is final. Lujan at 882. The threshold question, then, is: was the issuance of the Presidential Permit agency action or presidential action? The court concludes the action here was presidential action.

[¶21.] In Franklin v. Massachussets, 505 U.S. 788, 112 S.Ct. 2767 (1992) the United States Supreme Court set forth the test for determining whether the President's actions are subject to the APA. If the president is the final actor in the process, then his "duties are not merely ceremonial

or ministerial." Id. at 800. Here, Executive Order 13337 explicitly states that the President retains the authority to issue a final decision on whether or not to issue the Presidential permit. 69 Fed. Reg. 25,299, 25,300 (April 30, 2004). It is clear, then, that the President is the final actor in determining whether a permit should be issued. The President is not obligated to approve any applications for permits and, until he does, there is no final action.

[¶22.] Once the President takes final action, as is the case here, the next step is to determine whether the President "is an 'agency' within the meaning of the act." Franklin at 800. The Supreme Court has determined that the President is not considered an "agency" for purposes of APA analysis.

> The President is not explicitly excluded from the APA's purview, but he is not explicitly included, either. Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President1 to the provisions of the APA. We would require an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion. . . As the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements.

Id. Internal citations omitted

[¶23.] In Franklin, the President was acting pursuant to statutory authority. Here, the President was not acting under statutory authority, but instead, was acting under his inherent constitutional authority to manage foreign affairs. This distinction does not change the result. In this case, the proposed pipeline crosses international borders. Under the federal Constitution, then, the authority to regulate such a project vests in either the legislative or executive branch of government. Congress has failed to create a federal regulatory scheme for the construction of oil pipelines, and has delegated this authority to the states. Therefore, the President has the sole authority to allow oil pipeline border crossings under his inherent constitutional authority to conduct foreign affairs.

> Not only, as we have shown, is the federal power over external affairs in origin and essential character different from that over internal affairs, but participation in the exercise of the power is significantly limited. In this vast external realm, with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation. He makes treaties with the advice and consent of the Senate; but he alone negotiates. Into the field of negotiation the Senate cannot intrude; and Congress itself is powerless to invade it. As Marshall said in

11

his great argument of March 7, 1800, in the House of Representatives, 'The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations.'

U.S. v. Curtiss-Wright Export Corporation, 299 U.S. 304, 319, 57 S.Ct. 216, 220 (1936)

[¶24.] The plaintiffs argue that, since many of the steps leading to the issuance of the permit were completed by the Department, the classification of action is transformed from presidential to agency. This argument is without merit. The President is free to delegate some of his powers to the heads of executive departments, as he has done here, and those delegation actions that are carried out create a presumption of being as those of the President. Runkle v. U.S., 122 U.S. 543, 30 L. Ed. 1167 (1887); Bishop v. U.S., 197 U.S. 334, 25 S. Ct. 440 (1905).

[¶25.] The court finds that the actions taken pursuant to Executive Order 13337 are presidential in nature, and therefore, do not confer upon the plaintiffs a private right of action under the APA. Dalton v. Specter, 511 U.S. 462, 114 S.Ct. 1719 (1994). Consequently, plaintiffs NHPA, NEPA, and APA claims must fail.

[¶26.] However, even if the court were to determine that the actions were in the nature of "agency" and thus, subject to scrutiny under the APA, under the APA, a court "must uphold agency action unless it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" Friends of Richards-Gebaur Airport v. F.A.A., 251 F.3d 1178, 1185 (8th Cir. 2001) (quoting 5 U.S.C. § 706(2)(A)).

[¶27.] Plaintiffs claim that defendants were obligated to survey of 100% of the proposed pipeline route for archaeological artifacts. However, plaintiffs cite no authority for this proposition. In fact, established law reveals just the opposite. That is, 100% of the proposed pipeline route need *not* be surveyed. "The regulations do not expressly require agencies in all cases [to] completely to survey impact areas, and in fact recognize that the need for surveys will vary from case to case. See C.F.R. §§ 800.4(a)(1), (2)" Wilson v. Block, 708 F.2d 735, 754,(App. D.C. 1983). In Wilson, only 35% of the total area to be developed was surveyed. Here, plaintiffs claim roughly 25% was surveyed. Moreover, the Code of Federal Regulations section which addresses this issue does not require a survey of the entire 100% of the proposed route. "The agency official shall make a reasonable and good faith effort to carry out appropriate identification efforts, which *may* include background research, consultation, oral history

interviews, sample field investigation, and field survey." 36 C.F.R. § 800.4(b)(1) (2004) (emphasis added).

[¶28.] It is clear, then, that there is no requirement that a survey of 100% of the area to be developed be conducted. I find and conclude that if defendants actions are subject to APA analysis, it was not an abuse of discretion to only survey roughly 25% of the proposed pipeline route in South Dakota.

[¶29.] Additionally, defendants engaged in at least four meetings with the plaintiffs at various times and locations throughout the application process prior to the permit being issued. As a whole, it cannot be said that defendants failed to use good faith efforts in complying with the law during the application process. Therefore, even if plaintiffs have standing to challenge the issuance of the permit and such action is "agency" action as opposed to "Presidential," I do not find that the DOS's decision was arbitrary or capricious. The Department made a reasonable and good faith effort to identify historic properties potentially affected by the proposed project, as well as government-to-government consultation. This is all the law requires.

## VI. Treaty/Trust Claim

[¶30.] Finally, it is critical to note that this proposed project – at no point – crosses the boundaries of any present-day reservations in South Dakota. The proposed pipeline, although running, in part, through lands previously ceded to the United States will be located exclusively on land that was restored to the public domain. *See* Rosebud Sioux v. Kneip, 430 U.S. 584, 587-88 (1977); Oglala Sioux Tribe of the Pine Ridge Indian Reservation v. United States, 21 Cl. Ct. 176, 179 (Cl. Ct. 1990); Oglala Sioux Tribe v. U.S. Army Corps of Eng'rs, 537 F. Supp. 2d 161, 171 (App. D.C. 2008) and DeCoteau v. Dist. County Court, 420 U.S. 425, 427-28 (1975). When the Tribes ceded the land in question back to the United States, it "lost the right of absolute use and occupation of lands . . . conveyed, [and therefore,] the Tribe no longer ha[s] the incidental power to regulate the use of the lands by non-Indians. South Dakota v. Bourland, 508 U.S. 679, 688, 113 S.Ct. 2309, 2316 (1993) (citing Montana v. U.S., 450 U.S. 544, 559, 101 S.Ct., 1245, 1255 (1981)).

[¶31.] It is more than fairly debatable whether the plaintiffs still have treaty rights in lands that were ceded to the United States. However, even if they do, to establish a trust duty, the plaintiffs

"must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." U.S. v. Navajo Nation, 537 U.S. 488, 506, 123 S.Ct. 1079, 1091 (2003). Plaintiffs have failed to do so. Plaintiffs have not identified any treaty language that imposes, on the government, a specific duty regarding preservation of historic resources. Consequently, the plaintiffs have failed to establish a treaty basis for their trust claim, and therefore, even if this court has jurisdiction, the claim should be dismissed for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6).

[¶32.] I want to emphasize that the granting of this motion will not give the defendants a free pass to "do-as-they-please." They will, of course, still be subjected to the rigorous federal environmental and historical preservation laws throughout the construction and operation phases of the proposed pipeline. In this case, however, the court lacks the authority to strike down the issuance of the permit. Alternatively, if the court did have such power, I find that a good faith effort was made to identify historic properties that may be affected by this project.

[¶33.] Even with the granting of the permit, North Dakota and South Dakota have and are exercising considerable state regulation of the construction and operation of the pipeline.

**ORDER**

[¶34.] Based upon the foregoing,

[¶35.] IT IS ORDERED that the motions to dismiss (Docs. 26 and 27) are granted.

Dated this 28th day of September, 2009.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: Barbara Paepke
DEPUTY
(SEAL)